UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF TENNESSEE
AT CHATTANOOGA

| | |
|---|---|
| CITY OF CHATTANOOGA, TENNESSEE, ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| v. ) | No.: 1:19-CV-176-KAC-CHS |
| ) | |
| WALKER COUNTY GENERAL WATER ) | |
| & SEWERAGE AUTHORITY, WALKER ) | |
| COUNTY, GEORGIA ) | |
| ) | |
| Defendant. ) | |

**MEMORANDUM OPINION AND ORDER**

This case is before the Court on (1) "Walker County General Water & Sewerage Authority's Motion for Summary Judgment" [Doc. 52] and (2) "Plaintiff City of Chattanooga's Motion for Summary Judgment" [Doc. 55]. For the reasons below, the Court **GRANTS** "Plaintiff City of Chattanooga's Motion for Summary Judgment" [Doc. 55] and **DISMISSES** Plaintiff City of Chattanooga's claims for quantum meruit and unjust enrichment. The Court **DENIES** "Walker County General Water & Sewage Authority's Motion for Summary Judgment" [Doc. 52].

**I.     Background**

Walker County General Water & Sewerage Authority, Walker County, Georgia ("Walker County") "has contracted with the City of Chattanooga [("Chattanooga")] for years to handle, treat and dispose . . . of Walker County's wastewater" [Doc. 55-3 at 8 (Deposition of Brandon Whitley ("Whitley Dep.") 21:20-25)]. In 1994, Walker County and Chattanooga entered into a bilateral agreement for a term of twenty (20) years whereby Chattanooga provided treatment for large portions of Walker County's raw sewage at Chattanooga's Moccasin Bend Wastewater Treatment Plant [*See* Doc. 53-1]. During the term of the 1994 agreement, Chattanooga was sued in federal

court for alleged wastewater discharge violations. *See United States et al. v. Chattanooga*, Case No. 1:12-cv-245 (E.D. Tenn). Chattanooga entered into a federal Consent Decree that required improvements to and expansions of the Moccasin Bend Wastewater Treatment Plant's treatment processes and infrastructure [Doc. 55-17]. Under the Consent Decree and the Moccasin Bend Wastewater Treatment Plant's National Pollutant Discharge Elimination System ("NPDES") permit, Chattanooga is "required to enter into contracts called interjurisdictional agreements to receive, treat, and dispose of waste[]water from certain communities" [Doc. 55-1 at 10 (Deposition of Jeffrey Alan Rose ("Rose Dep.") 30:3-19)].

On April 4, 2016, Chattanooga and Walker County entered into an interjurisdictional agreement governing Chattanooga's treatment and disposal of Walker County wastewater ("2016 IJA") [*See* Doc. 52-3]. The Parties amended the 2016 IJA in November 2016 to remove a reference to a city council resolution, but it otherwise remains unchanged [*See* Doc. 52-4]. The 2016 IJA "remain[s] in effect for a period of fifteen (15) calendar years" [*See id.* ¶ 2(a)].

The 2016 IJA is to be "enforced and interpreted according to the laws of the State of Tennessee" [*Id.* ¶ 23(h)]. It is a fully integrated agreement [*See id.* ¶ 23(a)]. "[N]o other document, nor any representation, inducement, agreement, understanding, or promise, constitutes any part of this Agreement, nor shall it be used in construing the terms of" the Agreement [*Id.*]. But the terms used in the Agreement "have the meanings assigned to them in the [Clean Water Act ("CWA")], 33 U.S.C. §§ 1251 et seq., and regulations promulgated under the CWA" [*Id.* ¶ 3].

Chattanooga charges Walker County for the treatment and disposal of Walker County wastewater. Under the 2016 IJA, "Walker County shall pay Chattanooga" the "lower of" the "billable flow" charge or the "total flow" charge [Doc. 52-4 ¶ 14]. Chattanooga began billing

Walker County based on "total flow" after July 1, 2017 [Doc. 55-3 at 9, 11 (Whitley Dep. 25:8-22, 30:3-7)].

This dispute revolves around the "total flow" charge. In pertinent part, the IJA provides:

> c) Total Flow. The ***total flow charge is equal to the applicable regional operation and maintenance for wheelage and treatment plus the applicable regional charge for debt.*** The amount due from the regional user shall be the dollar amount derived by applying the total flow charge to the quantity of water measured by a flow meter installed and maintained at or near the point of inter-connection between the system of the regional user and the Chattanooga system. . . .

[Doc. 52-4 ¶ 14 (emphasis added)]. Paragraph 16 required Chattanooga to periodically revise the rates it charged users, including Walker County:

> a) Chattanooga agrees to periodically revise the charges for users or user classes to accomplish the following:
>    1. Maintain the proportionate distribution of operation and maintenance costs among users and user classes as required by federal law and regulations (See 33 U.S.C. § 1284(b) and 40 C.F.R. § 35-020, et seq.).
>    2. ***Generate sufficient revenue to pay the total operation and maintenance costs necessary to the proper operation and maintenance (including replacement) of the treatment works***.
>    3. Apply excess revenues collected from a class of users to the costs of operation and maintenance attributable to that class and adjust the rates accordingly.
>    4. To comply fully with Section 204(b) of the Act (33 U.S.C. § 1284(b)) and all applicable federal or state laws and regulations.
>    5. The cost of operation and maintenance of Chattanooga's WCTS and treatment works not used by Walker County under this agreement shall be specifically considered in said rate charge system and such cost shall be proportionately distributed to Chattanooga.
>
> b) Chattanooga agrees to review said rates annually, and make appropriate revisions thereto. Chattanooga shall give Walker County not less than sixty (60) days written notice of any proposed rate increase.

[*Id.* ¶ 16 (emphasis added)]. Paragraph 18 placed additional obligations on Chattanooga: "Chattanooga covenants and agrees to acquire, equip, operate, and maintain sufficient treatment facilities to comply with the NPDES Permit…" [*Id.* ¶ 18].

3

In accordance with these obligations, for the fiscal year ending June 30, 2018,[1] Chattanooga raised the "Total Regional Charge (Wheelage and Treatment)" for users billed based on "total flow," including Walker County, from $1.8114 to $2.1888 [*Compare* Doc. 52-8 at 7 *with* Doc. 52-9 at 9]. A Chattanooga budget ordinance broke the "Total Regional Charge (Wheelage and Treatment)" into a "Regional Operation & Maintenance Charge" of $0.8434, a "Regional Debt Charge" of $0.4434, and a "Regional Capital Charge" of $0.9020 [*See* Docs. 52-9 at 9; 55-11 at 5 (Deposition of Ed Wellman ("Wellman Dep.") 11:7-17)]. Itemization of a "Regional Capital Charge" was "meant to be a function of transparency" for customers, indicating the capital charges that were "being driven by" the federal Consent Decree [Doc. 55-11 at 5 (Wellman Dep. 11:6-17)].

Walker County's invoices increased [*See* Docs. 55-3 at 10 (Whitley Dep. 29:2-8); 55-4 at 1]. Beginning in July 2017, Walker County failed to pay the full amount of its invoices, asserting that the "regional capital charge" was improper under the 2016 IJA because "the [total] flow charge does not include a 'capital' portion" [Doc. 55-3 at 11, 21 (Whitley Dep. 33:21-25, 70:10-21)].

Beginning on July 1, 2018, Chattanooga's budget ordinance stopped itemizing the "Total Regional Charge (Wheelage and Treatment)" into a "Regional Operation & Maintenance Charge," a "Regional Debt Charge," and a "Regional Capital Charge" [*See* Docs. 52-10 at 10; 52-14 at 20 (Deposition of Tim Ian Maddox ("Maddox Dep.") 73:9-19)]. Instead, Chattanooga identified a "Regional Operation & Maintenance Charge" of $1.7454 and a "Debt Charge" of $0.4434, for a "Total Regional Charge (Wheelage and Treatment)" of $2.1888 from July 1, 2018 through June 30, 2019 [*See* Docs. 52-10 at 10; 52-14 at 20 (Maddox Dep. 73:9-19)]. But Walker County

---

[1] The relevant fiscal year runs from July 1 to June 30 [*See* Docs. 52-24, 52-25, 52-26, 52-27]. For example, "fiscal year 2018" ran from July 1, 2017 to June 30, 2018.

continued to underpay its invoices through July 2019 [*See* Docs. 55-5 at 4 (Deposition of Gene Allen Toney, II ("Toney Dep.") 8:1-10); 55-3 at 11-12, 14 (Whitley Dep. 33:21-34:7, 43:11-24)]. The disputed portion of Walker County's invoices is $1,888,780.38 [Doc. 55-5 at 4 (Toney Dep. 8:1-10)].

> In the event of a violation of the 2016 IJA, Paragraph 20 provides:
>
> a) Walker County shall be liable for stipulated penalties to Chattanooga for any violations of this Agreement as specified herein. A violation includes failing to perform any obligation required by this Agreement. . . .
> c) Walker County shall pay any stipulated penalty within sixty (60) days of receiving Chattanooga's written demand. . . .
> e) If a violation exceeds thirty (30) days or if Walker County fails to make payment of any stipulated penalty within sixty (60) days, it shall be grounds for immediate termination of this Agreement by Chattanooga. Chattanooga may terminate this agreement and the termination of the physical inter-connection(s) of Walker County WCTS by providing written notice.

[Doc. 52-4 ¶ 20]. On September 16, 2021, Chattanooga sent a letter to Walker County noting the underpayment of $1,888,780.83 and requesting stipulated penalties in the amount of $23,382,500 [Doc. 55-6 at 2]. Chattanooga's request was based on "Walker County's refusal to timely pay the full amounts owed [in] material breach of the parties' Agreement" and Walker County's "further breach[]" "by not following the dispute resolution procedures set forth in Paragraph 21" of the 2016 IJA [*Id.*]. Walker County replied on November 17, 2021, stating that Walker County "denies that [Chattanooga] is entitled to the Stipulated Penalties . . . and believes that such Stipulated Penalties are inapplicable to the alleged unpaid invoices pursuant to the plain meaning of the language of the [2016 IJA] as a whole" [Doc. 55-7 at 2]. Walker County has not paid the disputed portion of the invoices or the requested stipulated penalties.

On June 14, 2019, Chattanooga filed a Complaint, alleging breach of contract by Walker County for failing to pay its invoices in full [Doc. 1 at 8-10]. Chattanooga also requested declaratory and injunctive relief and raised claims for quantum meruit and unjust enrichment in

5

Case 1:19-cv-00176-KAC-CHS    Document 84    Filed 02/18/25    Page 5 of 12    PageID #: 3879

the alternative to its contract claim [*Id.*]. On March 17, 2021, Walker County filed an "Amended Answer and Counter Complaint," which raised two counterclaims for breach of contract based on (1) imposition of the "regional capital charge" and (2) "improper payments" for "capital projects" [*See* Doc. 31 at 15-17].

The Parties filed cross-motions for summary judgment [Docs. 52; 55]. Given the complexity and length of the business relationship between Chattanooga and Walker County, the Court gave the Parties additional time to resolve this matter amicably outside of litigation. But an amicable resolution has not been reached. Accordingly, this matter is now ripe for adjudication.

## II.  Analysis

Under Rule 56, the Court "shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "[C]ontract interpretation is a question of law." *Ray Bell Constr. Co. v. Tenn.*, 356 S.W.3d 384, 386 (Tenn. 2011). Because the Court must "view all facts and inferences in the light most favorable to the nonmoving party," *Westfield Ins. Co. v. Tech Dry, Inc.*, 336 F.3d 503, 506 (6th Cir. 2003), "unique issues" may be posed when Parties file cross-motions for summary judgment, *see B.F. Goodrich Co. v. U.S. Filter Corp.*, 245 F.3d 587, 592 (6th Cir. 2001). However, the crux of this dispute is not based in fact. It is based in law—the interpretation of the 2016 IJA.

### A. The Plain Text Of The 2016 IJA Permitted Chattanooga's "Regional Capital Charge."

Under Tennessee law, a Party "'alleging breach of contract must prove: (1) the existence of an enforceable contract, (2) non-performance amounting to a breach of the contract, and (3) damages caused by the breached contract.'" *Franklin Am. Mortg. Co. v. Univ. Nat'l Bank of Lawrence*, 910 F.3d 270, 281 (6th Cir. 2018) (citing *Nw. Tenn. Motorsports Park, LLC v. Tenn.*

6

*Asphalt Co.*, 410 S.W.3d 810, 816-17 (Tenn. Ct. App. 2011)). Here, there is no dispute that the 2016 IJA is an enforceable contract. Instead, the dispute revolves around the proper interpretation of the Agreement.

"In Tennessee, the 'cardinal rule' of contract interpretation 'is that courts must interpret contracts so as to ascertain and give effect to the intent of the contracting parties.'" *Massachusetts Mut. Life Ins. Co. v. RCS - Germantown I, LLC*, 858 F. App'x 900, 903 (6th Cir. 2021) (quoting *Individual Healthcare Specialists, Inc. v. BlueCross BlueShield of Tennessee, Inc.*, 566 S.W.3d 671, 688 (Tenn. 2019)). "To effectuate that cardinal rule," the "written words" of the contract are "the lodestar of contract interpretation." *Id.* (quotation omitted). "Tennessee courts employ the 'rule of practical construction,'" but that rule "does not permit a court to 'vary, contradict, or supplement the contractual terms in violation of the parol evidence rule,' particularly where the agreement at issue is a fully integrated contract." *Boyd v. Martinez*, No. 22-6026, 2023 WL 4903173, *9 (6th Cir. Aug. 1, 2023) (quoting *Individual Healthcare Specialists, Inc.*, 566 S.W.3d at 698)).

"Absent ambiguity, contractual language 'is interpreted according to its plain terms as written, and the language used is taken in its plain, ordinary, and popular sense.'" *Id.* (quoting *Maggart v. Almany Realtors, Inc.*, 259 S.W.3d 700, 804 (Tenn. 2008)). "Contractual terms should be . . . construed harmoniously to give effect to all provisions and to avoid creating internal conflicts." *Massachusetts Mut. Life Ins. Co.*, 858 F. App'x at 903 (quoting *D & E Const. Co. v. Robert J. Denley Co.*, 38 S.W.3d 513, 518-19 (Tenn. 2001)). "Any 'contract must be viewed from beginning to end and all its terms must pass in review, for one clause may modify, limit or illuminate another.'" *Id.* (quoting *Cocke County Bd. of Highway Comm'rs v. Newport Utils. Bd.*, 690 S.W.2d 231, 237 (Tenn. 1985)).

7

The main issue here begins and ends with the plain, unambiguous text of the 2016 IJA, which read together establishes that the "regional capital charge" imposed by Chattanooga is recoverable as a component of the "total flow" charge [*See* Doc. 52-4 ¶ 14].

Under Paragraph 14 of the 2016 IJA, the "total flow charge is equal to the applicable regional operation and maintenance for wheelage and treatment plus the applicable regional charge for debt" [*Id.*]. Chattanooga must "periodically revise the charges for users or user classes to" "[g]enerate sufficient revenue to pay the ***total*** operation and maintenance costs necessary to the proper operation and maintenance (***including replacement***) of the treatment works" [*Id.* ¶ 16 (emphasis added)]. Read together, these provisions require Chattanooga to periodically revise its total flow charge to generate sufficient funds to pay the "total operation and maintenance costs" of the waterworks. That would include operation and maintenance costs that were necessary based on the federal Consent Decree. And the 2016 IJA required Chattanooga "to acquire, equip, operate, and maintain sufficient treatment facilities to comply with the NPDES Permit" [*Id.* ¶ 18].

Consistent with these expansive terms, the 2016 IJA does not limit Chattanooga's ability to further itemize or categorize the "regional operation and maintenance" charge. To read the 2016 IJA otherwise, as Walker County suggests, would "create[e] internal conflict" and introduce a provision that does not exist in the contract. *See Massachusetts Mut. Life Ins. Co.*, 858 F. App'x at 903 (quoting *D & E Const. Co. v. Robert J. Denley Co.*, 38 S.W.3d 513, 518-19 (Tenn. 2001)). Under the terms of the 2016 IJA, then, regardless of the language Chattanooga used to describe the "regional capital charge," Chattanooga was permitted to include the charge because it was part of the combined total "operation and maintenance" costs for the waterworks. Walker County does not persuasively suggest otherwise.

8

Both Parties spend significant time interpreting and relying on the "User Charge Guidance Manual for Publicly-Owned Treatment Works" [Doc. 52-5]. But the 2016 IJA is fully integrated [Doc. 52-4 ¶ 23(a)]. And the Agreement only provides that its terms "have the meanings assigned to them" in the CWA and "regulations promulgated under the CWA" [*Id.* ¶ 3]. The User Charge Guidance Manual is neither [*See* 52-5 at 4, 7]. By its terms, the Guidance Manual is "designed to supplement" certain regulations, and "the contents" of the Guidance Manual do not "necessar[il]y reflect the views and policies of the U.S. Environmental Protection Agency" [*See id.*].

Because the "regional capital charge" was proper under the 2016 IJA, Walker County breached the 2016 IJA by failing to pay the full amount of its invoices over two fiscal years starting in 2017. This caused $1,888,780.83 in damages to Chattanooga [*See* Doc. 55-5 at 4 (Toney Dep. 8:1-10)]. Therefore, the Court grants Chattanooga's Motion for Summary Judgment [Doc. 55] on its breach of contract and declaratory judgment claims. However, because Chattanooga succeeds on its breach of contract claim, the Court dismisses Chattanooga's alternative claims for quantum meruit and unjust enrichment, which cannot stand as a matter of law. *See Paschall's, Inc. v. Dozier*, 407 S.W.2d 150, 154 (Tenn. 1966) ("Actions brought upon theories of unjust enrichment, quasi contract, contracts implied in law, and quantum meruit are essentially the same."); *PHI Air Med., LLC v. Corizon, Inc.*, 628 S.W.3d 460, 470 n.8 (Tenn. Ct. App. 2021) (requiring that no contract exist to recover under these equitable theories).

For the above reasons, the Court also denies Walker County's Motion for Summary Judgment [Doc. 52] as it relates to Chattanooga's alleged breach through imposition of a "regional capital charge." Further, because Chattanooga was permitted to include the "regional capital charge" as part of the "total flow charge" as a matter of law, Chattanooga did not retain "excess" operation and maintenance revenues that were required to be rebated or refunded to Walker County

9

[*See* Doc. 52-4 ¶ 16(a)(3) (requiring Chattanooga to "[a]pply *excess* revenues collected from a class of users to the costs of operation and maintenance attributable to that class and adjust the rates accordingly" (emphasis added))]. Therefore, the Court denies Walker County's Motion for Summary Judgment [Doc. 52] as it relates to Chattanooga's alleged breach through failure to rebate or return excess revenues for capital projects too. And the Court grants Chattanooga summary judgment on Walker County's counterclaims because Chattanooga is entitled to judgment as a matter of law.

### B. Further Relief To Chattanooga Is Limited.

In addition to recovering its actual damages from Walker County's breach, Chattanooga requests (1) liquidated damages under the 2016 IJA and (2) "an order requiring Walker County to immediately begin undertaking the steps identified by Mr. Whitley to . . . facilitate the termination process" [*See* Doc. 73 at 7, 13-14]. The Court addresses request each in turn.

***First***, under Tennessee law, "[c]ontracting parties may agree to the payment of liquidated damages in the event of a breach." *Vanderbilt Univ. v. DiNardo*, 174 F.3d 751, 755 (6th Cir. 1999) (quoting *Beasley v. Horrell*, 864 S.W.2d 45, 48 (Tenn. Ct. App. 1993)). But "Tennessee law disfavors the enforcement of a liquidated damages provision when the provision serves only to penalize the defaulting party for a breach of contract." *Guiliano v. Cleo, Inc.*, 995 S.W.2d 88, 98 (Tenn. 1999). "[T]he fundamental purpose of liquidated damages is to provide a means of compensation in the event of a breach ***where damages would be indeterminable or otherwise difficult to prove***." *Id.* (emphasis added).

Here, although the 2016 IJA does not use the term "liquidated damages," Paragraph 20 is a liquidated damages provision. *See id.* at 97. And that provision covers Walker County's breach of the 2016 IJA through nonpayment [*See* Doc. 52-4 ¶ 20(a) ("Walker County shall be liable for

10

Case 1:19-cv-00176-KAC-CHS   Document 84   Filed 02/18/25   Page 10 of 12
PageID #: 3884

stipulated penalties to Chattanooga for violations of this Agreement as specified herein. A violation includes failing to perform any obligation required by this agreement . . .")]. However, Chattanooga may not recover the liquidated damages in Paragraph 20 because the "stipulated penalties" —hefty monetary penalties "per Violation per Day"—were not "a reasonable estimate of the potential damages" due to a breach and "actual damages" for a failure to fully pay charges were not "indeterminable or difficult to measure at the time the parties entered into" the 2016 IJA [*See id.* ¶ 20(b)]. *See Guiliano*, 995 S.W.2d at 100-101. Further, "the provisions and circumstances indicate that the parties intended merely to penalize for a breach of contract," making the liquidated damages provision "unenforceable as against public policy." *See id.* Accordingly, Chattanooga is entitled to recover its actual damages plus prejudgment interest, ensuring that Chattanooga is made whole given the length of this litigation. *See FLSmidth Inc. v. Fiber Innovation Tech., Inc.*, 626 F. App'x 625, 630-31 (6th Cir. 2015).

**Second**, Paragraph 20(e) of the 2016 IJA entitles Chattanooga to exercise its right to "immediately terminat[e]" the Agreement and "the physical inter-connection(s) of Walker County WTCS" [Doc. 52-4 ¶ 20(e)]. Under that provision, Chattanooga may "immediately terminat[e]" the 2016 IJA and "the physical inter-connection(s) of Walker County" "[i]f a violation exceeds thirty (30) days" [Doc. 52-4 ¶ 20(e)]. As discussed above, Walker County violated the 2016 IJA for more than thirty (30) days when it refused to make full payment to Chattanooga over two years. Thus, Chattanooga is entitled to "immediately" exercise its contractual rights to terminate (1) the 2016 IJA and (2) Walker County's physical connections to Chattanooga's wastewater system. *See Towe Iron Works, Inc. v. Towe*, 243 S.W.3d 562, 569 (Tenn. Ct. App. 2007) (Generally, a "court will not create or rewrite a contract simply because its terms are too harsh or

because one of the parties was unwise in agreeing to them."). Walker County identifies no persuasive legal argument otherwise [*See* Doc. 68 at 21-22].

Rather than exercising its contractual "immediate[]" right to terminate the Agreement and physical connections, however, Chattanooga seeks only an order "requiring Walker County to immediately begin undertaking the steps identified by Mr. Whitley to . . . facilitate the termination process" [*See* Doc. 73 at 7, 13-14]. That request is eminently reasonable and in recognition of the course of dealings between the Parties and difficulties with immediate disconnection identified by both Parties [*See e.g.*, Docs. 57 at 21, 68 at 22]. Therefore, the Court will enforce Chattanooga's requested remedy. Chattanooga is entitled to terminate the 2016 IJA. Walker County shall promptly begin undertaking the steps identified by Brandon Whitley to facilitate the termination process[2] [*See* Doc. 55-3 at 15, 16, 17].

## III. Conclusion

For the above reasons and as set forth above, the Court **GRANTS** "Plaintiff City of Chattanooga's Motion for Summary Judgment" [Doc. 55] and **DISMISSES** Plaintiff City of Chattanooga's claims for quantum meruit and unjust enrichment. The Court **DENIES** "Walker County General Water & Sewage Authority's Motion for Summary Judgment" [Doc. 52]. No claims remain in this action. An appropriate judgment shall enter.

SO ORDERED.

_____
KATHERINE A. CRYTZER
United States District Judge

---

[2] The Court declines to retain jurisdiction over this process.